# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-12-00559-CV

**T & V Optimum, LLC d/b/a Optimum Steel Industries, Appellant**

**v.**

**Andrew Romero d/b/a Romero Inspection and Fabrication, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 53RD JUDICIAL DISTRICT
NO. D-1-GN-11-000905, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING**

## M E M O R A N D U M   O P I N I O N

This appeal involves a dispute concerning the damages owed by a contractor to a subcontractor on several commercial construction projects. Following a jury trial, the court rendered judgment for the subcontractor on the jury's verdict. The contractor appeals. We will affirm the judgment.

## BACKGROUND

T&V Optimum, LLC d/b/a Optimum Steel Industries (Optimum) is a steel fabricator and contractor based in Kyle, Texas. Optimum is owned and operated by Thomas and Valerie Erickson. Thomas Erickson ran the business and oversaw the operations of the business, and his wife Valerie Erickson, the majority owner, served as bookkeeper and oversaw the accounting records. Optimum had agreements with various general contractors to fabricate and install steel building components.

Andrew Romero is a sole proprietor steel erector doing business as Romero Inspection and Fabrication (Romero). Optimum and Romero had two different business relationships. Optimum paid Andrew Romero a salary to work as its shop foreman and manage some of its steel-fabrication operations. This arrangement is not under review. Optimum also contracted with Romero to use his company as a subcontractor on some of its construction projects. The dispute involves these subcontracts.

Optimum subcontracted with Romero to erect steel on eleven commercial construction projects around Texas. James McCullough served as the Senior Project Manager for Optimum. During the course of the working relationship, Thomas Erickson and his project managers, including McCullough, had authority to hire steel-erection subcontractors for Optimum and to determine the terms of their agreements. McCullough primarily managed Romero's projects, but there were other project managers on some of Romero's projects. Optimum and Romero executed written contracts on six of the projects but did not have written contracts on the other five.

Romero filed suit against Optimum on several grounds to recover payment for compensation he alleged he was owed on each of the eleven projects, and Optimum asserted counterclaims. Several allegations by both sides were abandoned or were not submitted to the jury. Three of Romero's claims were submitted to the jury; Optimum does not complain on appeal about submission of the jury charge.

The jury returned a verdict for Romero on his breach-of-contract claim. The jury found that Optimum failed to comply with all eleven agreements but did not find that Romero had

2

violated any of the contracts. Optimum does not challenge these findings. Instead, Optimum challenges the damages awarded Romero pursuant to the jury's verdict.

Jury Question number 5 inquired about the amount owing to Romero, if any, on each separately listed construction project. The Ericksons had conceded at trial that Optimum owed Romero some improperly deducted expenses as well as retainage it had withheld on several written contract projects, although they argued that overall Romero still owed Optimum money. The jury answered a dollar amount as to each project and found that Optimum owed Romero a total of $704,010.07 on the eleven projects. Romero moved for entry of judgment based on the jury's verdict and the trial court's findings on attorney's fees.[1] Optimum filed a motion asking the trial court to disregard the jury's answers on damages.

The trial court denied Optimum's motion and rendered judgment for Romero on the verdict. Optimum did not file a motion for new trial.

Optimum complains on appeal that (1) the judgment with respect to damages does not conform to the pleadings, (2) the evidence is legally insufficient to support the jury's verdict on damages, and (3) the damages awarded are excessive.

## STANDARD OF REVIEW AND DISCUSSION

*Whether Damages Are Excessive*

Optimum complains on appeal that the damages found by the jury and awarded by the court are excessive. A motion for new trial is not required to preserve most complaints for

---

[1] By agreement, the parties submitted the issue of attorney's fees to the trial court.

appeal. However, a point in a motion for new trial is a prerequisite to complain on appeal that the damages found by the jury are excessive. Tex. R. Civ. P. 324(b)(4). Because Optimum did not file a motion for new trial, this complaint is waived.

***Whether Damages Conform to Pleadings***

Optimum also complains that the judgment with respect to damages does not conform to the pleadings. *Latch v. Gratty, Inc.*, 107 S.W.3d 543, 546 (Tex. 2003); Tex. R. Civ. P. 301. Romero alleged that Optimum had breached their agreements and prayed for actual and consequential damages resulting therefrom. Optimum's complaint and argument on this issue relate to five of the written contracts,[2] specifically the change-order provisions. Optimum complains that the judgment is not supported by Romero's pleadings because Romero based his complaint on the parties' written agreements but the damage verdict does not follow the terms of the parties' written contracts and in fact contradicts their terms. Optimum argues that the written contracts called for changes and additional work to be compensated on a cost-plus basis, that is, the actual cost to Romero plus ten percent, but the jury apparently awarded damages on a different basis. Therefore, Optimum contends, the judgment does not conform to the pleadings. Romero responds, among other things, that only one of the contracts (Matthews Street) did not expressly allow for lump-sum change orders, and Erickson acknowledged that Optimum had even paid Romero for change orders on this project on a lump-sum basis. Further, Romero's pleadings requested compensation based on the

---

[2] Optimum does not lodge any complaint regarding the $3,050 awarded for the "Tmobile project."

4

parties' agreements, and the verdict and judgment are based on evidence Romero presented about the method the parties actually used to compensate him under the contracts.

Finding no inconsistency between the damages and the pleadings, we overrule this complaint on appeal.

***Whether Legally Sufficient Evidence Supports the Verdict on Damages***

Finally, Optimum complains that the evidence is legally insufficient to support the jury's verdict on ten of the eleven projects. A party challenging the legal sufficiency of the evidence supporting an adverse finding on an issue for which an opposing party has the burden of proof will prevail if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *See City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists when the evidence supporting the finding, as a whole, rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997). When conducting a legal-sufficiency review, we view the evidence in the light most favorable to the judgment, crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not. *City of Keller*, 168 S.W.3d at 807. We indulge every reasonable inference that would support the trial court's findings. *Id*. at 822. The final test for legal sufficiency must always

5

be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 827.

The trial took five days. Six witnesses testified, including the parties, McCullough, a steel-contractor expert, and a forensic accountant. Voluminous records concerning the multiple transactions and projects were introduced into evidence. Copies of several years of Romero's business banking transactions were also admitted. Optimum prepared extensive summaries of the records concerning payments, payrolls, credits, pay applications, and project expenses and distributions drawn from its records and view of the evidence; Romero introduced other summaries drawn from Optimum's information and his view of the evidence.[3] Thomas Erickson testified that he requested some of the summaries, and Valerie Erickson reviewed them for accuracy. All of these summaries and exhibits were admitted without objection.

The evidence showed that Romero had an office in his house or garage; it also showed that he was a good steel erector but a poor record keeper. He was given copies of the written agreements and copies of the change orders and kept all of his records randomly in his house, garage office, or in a bag in his vehicle. Romero's house burned down a few days after he filed this litigation, and he had few records remaining.

---

[3] All parties agree that the evidence was overwhelming and confusing for the jury. Understandably, the same has been true for all concerned. For example, in their briefs, the parties sometimes incorrectly referred to exhibit numbers and project names. Optimum argues that there is no evidence in the record to support an award to Romero of $38,880.56 on the Data Center Project, when Thomas Erickson testified that this amount is owing pursuant to the contract on this project. He also testified that Optimum owes $17,145 on the East Avenue Project, rather than the $14,632.02 as Optimum first stated. We have found several such inconsistencies in both briefs. We have reviewed the record carefully in an attempt to discuss the facts accurately.

Optimum had offices that contained its office furniture and equipment, flat screen monitors, file cabinets, files, and records. Optimum had a file on each project, which should have included the written agreements and all change orders, along with other records on each project, as well as similar information on the projects undertaken without written agreements. Copies of change orders and other documents were also saved onto the laptop computer McCullough used at the office. At some point during the dispute, the office was broken into. For some reason, only the laptop was stolen, and it was never recovered. As a result of these events, the company's records on each project were either incomplete and missing documents or they were not produced for discovery. Thus, although the evidence was extensive, one of the written contracts was not in evidence, and few of the change orders were in evidence.

The facts of the parties' relationship further complicate the various payment arrangements between Optimum and Romero. At first Romero did not have the capital to pay his workers, so Optimum paid them and properly deducted these amounts from its payments to Romero. Optimum also paid Romero's insurance some of the time. Later, Romero was able to pay his own payroll, and he would submit pay applications to Optimum and be paid for sums due him, then he would pay his workers. Under their third arrangements, Optimum again paid Romero's payroll and some expenses but did not compensate Romero on his pay applications, although Romero continued submitting pay requests. Romero testified that Thomas Erickson told him that Optimum was having some cash-flow issues but that Romero would be paid at the end of the project. Erickson disputed the fact; Romero was never paid, and this is some of the compensation he seeks.

Romero also had difficulty preparing the necessary pay applications, documents, and paperwork required on his part, and Optimum needed this information to keep up with its project billings. Romero first retained a commercial firm to do payroll for him, but they were very expensive. Later, he paid McCullough $150 to $200 per week to prepare his pay applications after hours and submit them to Optimum. Romero and McCullough testified that Thomas Erickson knew of this arrangement, but Erickson denied that he knew the extent of the arrangement or that Romero was paying McCullough.

There was no dispute at trial that Romero had satisfied all conditions precedent to recovery and that his workers had done considerable work on the projects. Romero relied upon Optimum's summaries with respect to the hours of labor per project, some in the thousands. Optimum did not plead or submit the affirmative defense of offset. Nevertheless, Optimum offered evidence of payments it claimed to have made to or on behalf of Romero and other evidence for which it believed it was entitled to credit. Thomas Erickson conceded that Optimum owed money to Romero but claimed that the net effect was that Romero owed Optimum a little less than $100,000. Obviously, the jury did not agree.

Initially Optimum contracted in writing with Romero to do work on a fixed-price lump-sum basis; eventually, they had six projects with written agreements. The terms of the contracts were similar but not all the same. At least one of the written contracts (Barton Place) had been recently seen by the parties but had apparently disappeared during discovery and is not in evidence.

8

The written contracts stated that Romero would provide equipment, but what exactly that included was disputed. The parties disagreed, for example, whether this included heavy equipment. McCullough testified that under their agreements "equipment" did not include the costs for heavy equipment such as cranes, hoists, scaffolding, or lifts, which had to be rented, and that Romero was not responsible for paying these rental costs. Romero agreed. In some cases, Optimum rented this heavy equipment and deducted the amount from Romero's reimbursement. Only one contract (Matthews Street Garage) expressly allowed Optimum to deduct from Romero the cost of equipment rental, and Romero did not dispute this fact or seek reimbursement for this deduction.

At least one of the written contracts (Data Center) expressly stated that Optimum could not deduct equipment rental from Romero, although Optimum had done so. Thomas Erickson agreed that Romero was entitled to be paid this amount. Romero testified that a second contract had explicitly stated that Optimum could not deduct for equipment, but this was the contract (Barton Place) that had been lost during litigation and was not in evidence. The Ericksons also conceded at trial that Optimum owed Romero retainage on several written-contract projects and that these retained funds were owed to Romero.

McCullough and Romero both testified concerning how they arrived at the fixed-price terms of the Optimum written contracts. McCullough and Romero together would review the project plans to try to determine how long the project would take and the number of workers that would be required. They would then multiply the figures by Romero's billable rate of $45 per hour, to cover such items as labor, insurance, payroll, overhead, and profit. McCullough stated that he would also review the terms with Thomas Erickson before he wrote the terms into the contracts.

9

Changes were often made to the written contract work, and that affected compensation. As projects progressed, McCullough and Romero executed numerous written change orders. The contracts stated that changes had to be in writing and generally called for compensation for additional work on a cost-plus basis. McCullough testified that, despite this provision, they figured cost and compensation for the change orders on the same lump-sum basis as the original contracts, at a rate of $45 per hour. The $45 rate is also reflected in some of the change-order documents and in some of the payment documents. Optimum and Romero signed the change orders; an original would be placed in Optimum's file on the project, an electronic copy would be saved in McCullough's laptop at Optimum, and Romero would receive a copy. McCullough signed the contracts and change orders on behalf of Optimum.

Thomas Erickson testified that he did not know that the change orders were reduced to writing, although there was also testimony that he saw them. He was not concerned with this fact, however, because he did not require written change orders. At trial, Optimum did not deny that there were change orders and conceded that Romero did a substantial amount of additional work on some projects. Even though it agreed that all conditions precedent had been met, Optimum now argues on appeal that Romero cannot recover any damages for the unpaid work because he could not produce copies of the written change orders.

Eventually, Optimum hired Romero to take over projects that other steel erector subcontractors had handled poorly and were "a mess." He was directed to begin work immediately

and to work on a time-and-materials (T&M) basis because time was too short to prepare a written contract, and it was unclear what would be required to redo and complete the project.[4]

There is no question that Optimum hired Romero for a total of five projects for which there were no written contracts. The terms on which Romero was retained were disputed. Thomas Erickson testified that he had directed his project manager to give Romero a specific budget for each job, but Erickson admitted that he did not know whether this was done, and neither he nor anyone else testified as to an amount. There was no evidence in the record of a budget amount for any of the projects. Romero denied that anyone had set or given him a budget.

Everyone agreed that working on a T&M basis was risky; the contractor does not know the projected cost, the subcontractor has no guarantee what he will receive, and there can be significant cost overruns. Romero's steel-erection expert witness, Travis Howard, testified that it is not uncommon for a contractor to hire a subcontractor on a T&M basis when circumstances require but that such contracts are risky. In this type of agreement, the subcontractor is not paid on a lump-sum basis but rather is paid for the number of hours he and his employees work and for his materials, with a factor for profit. There are no change orders, because there is no contract from which to deviate. Romero testified that he wanted written contracts but was told there was no time for that, and he should just do what work was required and bill for it. When a successor subcontractor must redo faulty work of an earlier one, however, the budget can double or worse, and these may not be costs that can be compensated by the general contractor or passed along, depending

_____

[4] In one instance, for example, the project involved building a stadium, but the previous subcontractor had put the press box on backwards.

upon the cause of the redo or who was responsible. The evidence indicates that such circumstances occurred here. All the changes or new charges do not necessarily come from general contractor changes. Thomas Erickson was shocked by the amount Romero requested to be compensated. The evidence shows that a number of Romero's T&M billings were paid on the basis he urges.

Both McCullough and Romero testified to their agreement with respect to T&M projects. McCullough testified that in a T&M arrangement, the subcontractor bills the contractor for labor hours, equipment hours, costs, profit, and overhead. In that regard, Romero stated he would charge for time, overhead, profit, and equipment. Romero testified that Erickson also agreed to pay him travel expenses and per diem on out-of-town projects. McCullough testified that, on the T&M projects, he agreed on behalf of Optimum to pay Romero $6.00 per hour for profit and overhead and to pay him $15.00 per hour for use of his equipment, including his welding machines. According to him, $15.00 per hour is standard for welding machines, and there was nothing unique about these T&M agreements. They figured the welding equipment rental at $15 per hour based on an estimated 80% of the total labor hours. McCullough and Romero testified that this was the agreement for the non-contract projects. Romero asserted that he was entitled to his $45 rate, a $6.00 rate for his profit and overhead, and $15 compensation for his welding equipment, based upon 80% of the time his laborers were working. Travis Howard testified that, in the industry, $45 per hour was low—the "going rate" was $55 and Howard paid as much as $70—and 80% was low—Howard paid based on 100% of labor hours without reduction. Howard explained that paying $15.00 an hour for welding machines on a project "is pretty standard in the industry." Further, Howard pays that amount "for

12

every man hour on the job," without a break, and not just when it is being used, because when a machine is on a job it cannot be used elsewhere.

According to Romero, Thomas Erickson agreed to pay him for his profit and overhead, at $6.00 per hour, and equipment rental, at $15.00 per hour, at the end of the T&M project. Optimum did not pay Romero for all of his profit, overhead, and equipment rental on the T&M projects. Optimum did pay him $15.00 per hour for renting his welding machines on other projects where Optimum erected the steel.

Optimum does not contest the fact that Romero provided valuable service on all the projects. However, Optimum asserts that Romero failed to prove how he was to be compensated.

Optimum contends that no evidence supports the jury's answers to damages in question 5 for several reasons. Almost all of Optimum's complaints are directed to the written contracts. First, the parties' written contracts required a written change order for any additional work in excess of the original contracts, and Romero introduced no written change orders. Second, there was no evidence supporting Romero's $45 rate, because the written contracts contained a cost-plus clause for properly calculating any damages owed for additional work beyond the written contract provisions. Third, Optimum argues that Romero's counsel prepared and introduced an exhibit (Plaintiff's Exhibit 75) containing "fabricated" factors, flawed calculations, and erroneous figures, upon which the jury apparently improperly relied when they should have disregarded the exhibit.[5] For these reasons, Optimum argues, the jury's answers do not comply with the terms of the written

---

[5] We note that Exhibit 75 contained information drawn from other evidence in the record, including Optimum's evidence, was testified to by a witness or witnesses, and was introduced without objection.

13

contracts and its finding of damages are excessive. Optimum asks this Court to find "that the jury's findings do not pass muster" and should be disregarded. These arguments necessarily pertain only to the five projects with written contracts.

Optimum's position is that Romero must be held to the terms of the written contracts and his compensation restricted to the amount it calculates, without regard to the terms agreed upon by its senior project manager and without regard to the manner in which it had compensated Romero during the course of the written-contract projects. Only one of the contracts (Matthews Place) requires a cost-plus compensation. The others also allow for lump-sum compensation.

The Ericksons acknowledged that they had withheld retainage on some of these projects, that they still owed these sums to Romero, and further that they had improperly deducted equipment rentals on at least one project, plus another to which Romero testified. Thus, there was some evidence in the record to support an award of damages to Romero on the written-contract projects.

Optimum also asserts that there is no evidence to support the jury's awards on the T&M contracts, but the specifics of its complaints are much less clear. Optimum argues as to each unwritten agreement that, "There is not an accurate or reliable basis for any calculation of the damages awarded" and, therefore, there is legally insufficient evidence to support the damages awarded.

Optimum contends that the amount the jury awarded is more than Optimum showed that it owes and that evidence to support the award is lacking. Optimum seems to argue that there is no evidence to support the jury's damage answers because there is no specific piece of evidence

14

or testimony calling for the specific amount of damages awarded. However, Optimum does not request remittitur, reduction, or rendition based on the evidence. Instead, Optimum requests that the judgment be reversed and a take-nothing judgment rendered in its favor.

Romero produced simple exhibits setting out his request for reimbursement. His case was based primarily upon the testimony of Romero and McCullough, using Optimum's payroll summaries and detailed records concerning the number of hours Romero's workers devoted to each project, the expenses, the amounts that Optimum had paid Romero, and other relevant details. Travis Howard calculated, summarized, and testified to the unpaid damages Romero requested as set out in McCullough's deposition testimony, Romero's testimony, and other evidence in the record. Plaintiff's Exhibit 75 relates to the written-contract projects. It sets out Romero's claim as to what he should have been paid, what he was in fact paid, and the difference he claimed was still owed him. The jury awarded damages on the written-contract projects in accordance with Plaintiff's Exhibit 75. Romero testified to all these figures, and Optimum also testified to the retainage owed and to certain equipment rental that it admitted should not have been deducted. Thus, although Optimum disputed Romero's evidence, the jury awarded him the damages he requested on the written-contract projects. We cannot say that the evidence is legally insufficient to support the verdict on these projects.

On the projects without a written contract, performed on a T&M basis, Plaintiff's Exhibits 72 and 73 were admitted without objection. Romero made his calculations based upon the number of labor hours set out in Optimum's payroll summaries. Based on Romero's and McCullough's testimony, Howard testified that Romero contended that he was entitled to profit and

15

overhead based on $6.00 per labor hour and compensation for equipment at 80% of labor hours at the rate of $15.00 per hour. Although Howard testified that payment for welding equipment is generally billed at 100% of labor hours, Romero agreed to lower terms in the agreements, and he requested to be awarded the lower percent. Exhibit 72 reflects Romero's damage calculation based on $6.00 per hour for his profit and overhead, plus 80% of his labor hours at the rate of $15.00 per hour. Romero and McCullough testified to this agreement with Optimum concerning the T&M projects. Through Plaintiff's Exhibit 73, Howard demonstrated that, even if Romero were awarded all that he requested on the T&M projects, plus what he already had been paid by Optimum on these projects, his overall rate would only be $38.13 per hour, well below the $50 "going rate" that Howard described or the $45 rate Romero alleged was agreed. Even so, the jury awarded Romero less than he requested on each project.[6] Romero sought a total of $249,630 on these T&M projects, but the jury only awarded him a total of $207,489.

Optimum attempts to determine how the jury made its decisions on each non-contract project. Using its own calculations, Optimum now speculates that the jury must have refused to award Romero any compensation for his profit and overhead at $6.00 per hour but instead awarded Romero rental damages based upon 100% of the labor hours, even though Romero conceded that 80% was the agreement. We note that there was evidence that Romero's overhead was modest because he worked out of his house. It is just as likely that the jury reduced his award for profit and overhead. We note also that while Howard testified that he usually paid $15.00 per hour

_____

[6] *See* Exhibit A to this opinion, which is a summary of the amount Romero requested for each project and the amount the jury awarded.

16

compensation for equipment based on 100% of labor hours and Romero was only seeking to be paid based on 80% of labor hours, the jury could have determined to reduce the compensation even more.

Nevertheless, Optimum speculates that the jury calculated the damages by awarding Romero $15.00 per hour for 100% of the labor hours, rather than 80% of labor hours as he requested, and thus incorrectly used the quantum meruit damage model to compensate him for a breach-of-contract award. While that math results in the amount of the jury award, it is equally possible that the jury simply reduced the amount Romero requested by some amount. For example, if the jury reduced Romero's profit and overhead rate to $3.00 per hour instead of $6.00 per hour, perhaps because Romero had limited overhead and also drew a salary for his day job with Optimum, but still only used 80% of labor hours for determining equipment compensation, the jury award would be the same. We cannot speculate that the jury used a quantum meruit measure to reach its award when the award is explainable on another ground that is supported by legally sufficient evidence. We decline to say how the jury, in its discretion, calculated the damages Romero was due under the evidence.

## CONCLUSION

After reviewing the evidence, we hold that Optimum waived its complaint that the damages awarded were excessive. We further hold that the judgment conforms to the pleadings and evidence. Finally, applying the appropriate standard of review to the evidence, we hold that there is legally sufficient evidence to support the damages verdict and judgment.

We overrule Optimum's complaints on appeal and affirm the judgment.

17

_____

Marilyn Aboussie, Justice

Before Chief Justice Jones, Justices Field and Aboussie\*

Affirmed

Filed:   August 1, 2014

    \*   Before Marilyn Aboussie, Chief Justice (retired), Third Court of Appeals, sitting by assignment.  *See* Tex. Gov't Code § 74.003(b).

| | Romero's Request | Optimum Agreed[1] | Jury Award |
|---|---|---|---|
| **Projects with Written Agreements** | | | |
| HCSC Data Center Project | $49,478.51 | $10,597.95 | $49,478.51 |
| | | $38,880.56 | |
| East Avenue Project | $46,597.20 | $17,145.05 | $46,597.20 |
| Barton Place Project | $179,448.61 | $46,300.20 | $179,448.61 |
| SA Hyatt Project | $748.00 | | $748.00 |
| Matthews Street Project | $217,198.75 | $9,152.50 | $217,198.75 |
| T-Mobile Project | $3,050.00 | $3,050.00 | $3,050.00 |
| **Projects With No Written Agreement** | | | |
| OLLCCC Project | $34,056.00 | | $28,380.00 |
| Brazos County Jail Project | $61,362.00 | | $51,135.00 |
| BISD Stadium Project | $114,228.00 | | $95,190.00 |
| Temple Hospital Project | $4,608.00 | | $3,840.00 |
| Greenway Lofts Project | $35,376.00 | | $28,944.00 |

---

[1] Thomas Erickson testified to retainage and these other amounts owing to Romero. Giving Romero credit for these amounts, however, Erickson testified that Romero still owed Optimum just under $100,000 based upon its allegations against Romero. The jury ruled for Romero.